UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

GABINO GENAO,

                             Plaintiff,

20-cv-10563 (GBD) (VF)

                -against-

**REPORT AND
RECOMMENDATION**

CITY OF NEW YORK, et al.,

                        Defendants.

-------------------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO: THE HONORABLE GEORGE B. DANIELS, United States District Judge**

      Plaintiff Gabino Genao ("Genao"), proceeding pro se and in forma pauperis, is presently incarcerated at Green Haven Correctional Facility, which is operated by the New York State Department of Corrections. Genao's remaining claims in this action are asserted against Assistant Deputy Warden Judemyr Glemaud ("Warden Glemaud"), Probe Team Captain Steve Hyppolite ("Captain Hyppolite"), and the City of New York (collectively, "Defendants"). Genao alleges claims under 42 U.S.C. § 1983 for violations of his federal constitutional rights stemming from events that took place on March 16, 2019, and March 17, 2019, when he was a pretrial detainee at Otis Bantum Correctional Facility, which is operated by the New York City Department of Corrections. Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, I respectfully recommend that Defendants' motion be **GRANTED.**

**<u>BACKGROUND</u>**[1]

As an initial matter, along with his opposition to Defendants' motion for summary judgment, Genao filed a declaration (ECF No. 127 at 1-3) and a Local Civil Rule 56.1 Statement of Undisputed Facts (<u>id.</u> at 4-7). Defendants filed their own Rule 56.1 statement (ECF No. 120) and also responded to Genao's Rule 56.1 statement (ECF No. 131). However, Genao did not file a response to Defendants' Rule 56.1 statement, where he would have admitted, denied, or contested the facts as required by the local rules. Instead, in his declaration and written opposition to Defendants' motion, Genao contested certain of Defendants' purported undisputed facts. <u>Compare</u> ECF No. 120 at ¶ 10 (Defendants' Rule 56.1 statement that Defendant Hyppolite did not deploy his pepper spray at any time) <u>with</u> ECF No. 127 at 13 (Genao claiming that Captain Hyppolite reported using pepper spray on Genao); <u>compare</u> ECF No. 120 at ¶ 13 (Genao was decontaminated "[w]ithin four hours of . . . being restrained") <u>with</u> ECF No. 127 at 2 (Genao claiming that he was not decontaminated for over five hours). Genao also includes additional facts in his declaration and written opposition that are not found in his Rule 56.1 statement. <u>See, e.g.</u>, ECF No. 127 at 2, 17 ("Plaintiff was taken to segregation intake yelling he could not breathe[;]" "Plaintiff also cried for his asthma pump[;]" and "Plaintiff complained of chest pains and needed his asthma pump for over 5 hours[.]").

Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of

---

[1] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the original pagination in those documents, including deposition transcripts.

the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). Although Genao is pro se, "[a] *pro se* litigant is not excused from this rule." Brandever v. Port Imperial Ferry Corp., No. 13-CV-2813 (KBF), 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (citation omitted).

Moreover, "[a] nonmoving party's failure to respond to a Rule 56[.1] statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) (citation omitted). However, given the "special solicitude" afforded pro se litigants "when confronted with motions for summary judgment," Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) (citations omitted), the Court, "in its discretion," has opted to "conduct an assiduous review of the record," and if Genao has contested any fact in Defendants' Rule 56.1 statement by pointing to admissible evidence, the Court has deemed those facts to be disputed. See Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted); see also Cherry v. Byram Hills Cent. Sch. Dist., No. 11-CV-3872 (ER), 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper [Local] Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions.") (citation and internal quotation marks omitted). But, the Court has not considered the factual assertions made by Genao, whether in his declaration, opposition, or Rule 56.1 statement, where the factual assertion is not supported by evidence in the record. See Berry v. Marchinkowski, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015) (disregarding factual assertions in plaintiff's opposition papers that "either do not contain citations to the record, or are not supported by the citations in the

3

record"); Davis v. Ventimiglia, No. 07-CV-6043 (LAP) (MHD), 2009 WL 4910047, at *1 n.1 (S.D.N.Y. Dec. 21, 2009) ("[T]his Court will accept as true only the statements in [p]laintiff's [Rule] 56.1 Statement that are supported by the factual record and will disregard the conclusory allegations.").

### A. Factual Background

On March 16, 2019, Genao was an inmate[2] in housing area 3 West at the Otis Bantum Correctional Facility. ECF No. 120 at ¶ 1; ECF No. 131 at ¶ 1; ECF No. 133-1 at 24. At around 9 p.m. (ECF No. 131 at ¶ 1), several officers, including Warden Glemaud and Captain Hyppolite, were in the housing unit.[3] ECF No. 120 at ¶¶ 9-11; ECF No. 119-3 at ¶¶ 2-3. Genao and multiple inmates[4] were in the dayroom of the housing unit. ECF No. 120 at ¶ 2; ECF No. 119-2 at 0:02:20.[5] In the officers' presence, some inmates in the dayroom climbed railings, threw objects,

---

[2] Genao states that "[a]t all times relevant herein Plaintiff was a Pre-Trial detainee." ECF No. 127 at 4. Because Genao was sentenced on March 29, 2022, Genao was a pretrial detainee at the time of the incident for purposes of analyzing his constitutional claims.

[3] The incident was captured by a handheld camera and Defendants submitted the video of the incident to the Court. ECF No. 119-2. Defendants submitted an affidavit from Captain Hyppolite, who identified some of the officers involved in the incident as seen in the video footage: Captain Hyppolite wore vest number 083 in the video footage (ECF No. 119-3 at ¶ 2); Officer Shaw wore vest number 098 (id. at ¶ 4); Captain Heeralal wore vest number 070 (id. at ¶ 5); Officer Kissoon was identified as the officer that "plaintiff charged at" in the video footage (id. at ¶ 6); and Warden Glemaud wore "a white shirt" and no vest during the incident (id. at ¶ 8).

[4] At his deposition, Genao testified that there were "15, 20" inmates in the dayroom. ECF No. 133-1 at 29.

[5] The Court has reviewed video footage of the incident. See ECF No. 119-2. Genao has challenged certain facts in Defendants' Rule 56.1 statement as they relate to the incident. See ECF No. 127 at 5-6. Where the video of the incident indisputably contradicts Genao's assertions, the Court adopts the version of the facts reflected in the video. See Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on [a motion for summary judgment] if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party."). The timestamps used herein for citations to the video refer to the hours, minutes, and seconds on the video player.

and yelled at the officers. ECF No. 120 at ¶ 3; ECF No. 119-2 at 0:02:20 to 0:09:43. Genao told the officers that the inmates wanted to be taken to intake. ECF No. 127 at 4; ECF No. 133-1 at 27; ECF No. 119-2 at 0:05:00 to 0:05:59. Captain Hyppolite instructed the inmates to return to their cells. ECF No. 127 at 5; ECF No. 119-2 at 0:06:30 to 0:06:39.

Genao and the other inmates got on their knees and placed their hands behind their backs. ECF No. 131 at ¶ 10; ECF No. 119-2 at 0:13:20. The inmates were warned that chemical agents could be used if they did not return to their cells. ECF No. 120 at ¶ 4; ECF No. 119-2 at 0:16:04 to 0:16:10. Around this time, Warden Glemaud left the housing unit. ECF No. 131 at ¶ 9.

While most of the inmates were on their knees, Officer Shaw deployed pepper spray in their direction. ECF No. 120 at ¶ 5; ECF No. 119-2 at 0:24:58 to 0:25:03. While Officer Shaw was using the pepper spray, the video footage shows Genao and Officer Kissoon engaged in a physical altercation, with the two eventually ending up on the floor. ECF No. 119-2 at 0:25:03 to 0:25:09; see also ECF No. 120 at ¶ 7; ECF No. 127 at 5. During that physical altercation, Captain Heeralal deployed pepper spray at Genao. ECF No. 120 at ¶ 8; ECF No. 119-2 at 0:25:03 to 0:25:09. Genao was subsequently restrained by the officers. ECF No. 120 at ¶ 9; ECF No. 119-2 at 0:25:09 to 0:25:20.

Genao was decontaminated in the early hours of March 17, 2019, around 12:30 a.m., within four hours of being sprayed with pepper spray.[6] ECF No. 131 at ¶ 22; ECF No. 120 at ¶ 13; ECF No. 133-1 at 47. Sometime later, in route to the clinic, Warden Glemaud told Genao, "you're not going to jack [report] any injuries." ECF No. 133-1 at 48-49; see also ECF No. 127

---

[6] Genao claims that he was not decontaminated until five or six hours after being sprayed. See, e.g., ECF No. 133-1 at 47; ECF No. 127 at 17. However, the parties agree that the incident began around 9 p.m. (ECF No. 131 at ¶ 1) and that Genao was decontaminated around 12:30 a.m. (id. at ¶ 22), which is 3.5 hours after the use of pepper spray.

at 6. Warden Glemaud also told Genao that "the doctor already knows you [are] not going to jack [report]" injuries. ECF No. 133-1 at 50; see also ECF No. 127 at 6.

Warden Glemaud was present while Genao was being examined in the clinic by Dr. Michael Latunji. ECF No. 133-1 at 53-54; ECF No. 127 at 6. While being examined, Genao denied having any injuries. ECF No. 120 at ¶ 14; ECF No. 119-4 at 1. In his report, Dr. Latunji reported that Genao's general appearance was "well-developed, no acute distress, no visible injury noted." ECF No. 120 at ¶ 14; ECF No. 119-4 at 1. The report also stated that Genao "denied any injury after DOC use of force . . . [n]o chest pain, no abdominal pain. He refused vital signs and physical examination, no visible injury noted." ECF No. 119-4 at 1.

## B. Procedural History

In his complaint, filed on December 14, 2020, Genao named five defendants: Captain Rivera, Captain Hyppolite, Warden Glemaud, "City Hall," and the City of New York. See ECF No. 2 at 1, 3. On March 20, 2023, Genao amended his complaint to add new defendants—Captain Heeralal, Officer Kissoon, Officer Shaw, Investigator Dwyer, and Captain LaCroix (the "New Defendants")—and to drop his claims against Captain Rivera and "City Hall." ECF No. 45. The New Defendants, except Captain Heeralal, moved to dismiss the claims against them on November 21, 2023. ECF No. 68. In a Report and Recommendation issued on July 12, 2024, the undersigned recommended granting the motion to dismiss and dismissing the claims as time-barred. ECF No. 92. On October 8, 2024, Judge Daniels adopted the report and recommendation, dismissed the claims against the New Defendants, and dismissed Genao's claim against Investigator Dwyer sua sponte as invalidly pled.[7] ECF No. 105 at 13-14.

---

[7] Genao subsequently filed a notice of appeal (ECF No. 112), which the Second Circuit dismissed as an improper interlocutory appeal (ECF No. 134).

The New Defendants omitted Captain Heeralal from their arguments for dismissal made in the November 2023 motion to dismiss. Now, in their motion for summary judgment, Defendants argue that Captain Heeralal was not properly served, and that Captain Heeralal's claims are barred by the statute of limitations—the same argument raised by the New Defendants in their November 2023 motion to dismiss. See ECF No. 121 at 2 n.1; see also ECF No. 70 at 3-7.

Genao first asserted claims against Captain Heeralal on March 20, 2023, but as discussed in the prior Report and Recommendation (ECF No. 92), Genao's claims accrued no later than March 17, 2019 (id. at 8). Consequently, Genao's claims against Captain Heeralal are barred by the statute of limitations for the same reasons that the claims against the New Defendants were barred. See id. at 6-15. Accordingly, I recommend that the Court dismiss the claims against Captain Heeralal because they are barred by the statute of limitations.

The City is named by Genao as a defendant for the claims asserted in Counts IV, VI, VII, and VIII. Those claims are also asserted against Officer Kissoon, Captain LaCroix, and Investigator Dwyer, but those defendants have since been dismissed from the case.[8] Defendants argue that dismissal of the claims against the City is warranted because the individual defendants upon whom liability against the City could be premised are no longer in the case. ECF No. 121 at 2 n.3. Defendants are correct.

A municipality, like the City, "may not be held liable under § 1983 for the actions of its employees under a theory of *respondeat superior*." Flores v. City of Mount Vernon, 41 F. Supp.

---

[8] Genao also asserted a spoliation claim in Count VIII against Warden Glemaud. ECF No. 45 at 13. However, Judge Daniels dismissed that claim because "there is no independent cause of action for spoliation under New York law, nor this Circuit." ECF No. 105 at 14 (internal citations omitted).

2d 439, 446 (S.D.N.Y. 1999). Instead, there must be an individual official who is alleged to have engaged in the conduct that resulted in a constitutional violation. See Dobryakov v. Vill. of Spring Valley Police Dep't, No. 08-CV-4488 (WWE), 2011 WL 1080316, at *5 (S.D.N.Y. Mar. 21, 2011) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)) ("[T]here can be no claim against a municipality under Monell if there is no underlying liability for a constitutional violation against individuals."). Because there are no individual defendants against whom the claims are asserted, there can be no Monell liability against the City. Accordingly, I recommend that Counts IV, VI, VII, and VIII against the City be dismissed.

Turning to the remaining claims in the case, in Counts I and II, Genao asserts a First Amendment claim against the City and Warden Glemaud for threatening to retaliate against Genao if he reported any injuries after the incident, and intimidating him into not reporting any injuries. ECF No. 45 at 11. In Count III, Genao asserts an excessive-force claim under the Fourteenth Amendment[9] against the City, Warden Glemaud, and Captain Hyppolite for the use of pepper spray. Id. In Count V, Genao asserts a deliberate-indifference claim against the City, Warden Glemaud, and Captain Hyppolite for being aware of Genao's asthma and contraindication for chemical agents but still using pepper spray on him. Id. at 12. Finally, in Count IX, Genao asserts a Monell claim against the City premised on the City's violation of the Nunez Consent Decree. Id. at 13.

---

[9] In Count III of his complaint, Genao alleges an Eighth Amendment violation for "cruel and unusual punishment." ECF No. 45 at 11. However, "[b]ecause [Genao] was a pre-trial detainee at the time of the alleged incidents, his cruel and unusual treatment claims arise under the Fourteenth Amendment's Due Process Clause, and not the Eighth Amendment's Cruel and Unusual Punishment Clause." Rickett v. Orsino, No. 10-CV-5152 (CS) (PED), 2013 WL 1176059, at *10 n.18 (S.D.N.Y. Feb. 20, 2013), report and recommendation adopted, 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013). Regardless, whether the claim is brought under the Eighth or Fourteenth Amendment, the legal standards are the same. Id.

Warden Glemaud, Captain Hyppolite, and the City of New York—the remaining Defendants in this case—filed their motion for summary judgment on July 7, 2025. See ECF No. 118. Genao submitted his opposition on October 8, 2025. ECF No. 127. On October 24, 2025, Defendants submitted their reply brief in further support of their motion. See ECF No. 131.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion . . . is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of demonstrating an entitlement to judgment as a matter of law and identifying the matter or matters that "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323; Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008).

A fact is material when it "might affect the outcome of the suit under the governing law." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (quoting Anderson, 477 U.S. at 248). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)); Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008) (noting that the Court must view all facts "in the light most favorable" to the non-

9

moving party). However, a court is not required to draw any inference that is "blatantly contradicted by the record, so that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo, 536 F.3d at 145. "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted, alteration in original). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); Wright v. Goord, 554 F.3d 255, 265-66 (2d Cir. 2009). For a genuine dispute regarding a material fact to warrant a jury trial, there must be sufficient evidence supporting the claimed factual dispute "to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo, 22 F.3d at 1224.

Genao is proceeding pro se and thus the Court must liberally construe his filings to raise the strongest arguments they suggest. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-75 (2d Cir. 2006). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence are insufficient to overcome a motion for summary judgment." Parker v. Fantasia, 425 F. Supp. 3d 171, 183-84 (S.D.N.Y. 2019) (alterations and internal quotation marks omitted) (quoting Houston v. Teamsters Local 210, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014)).

**DISCUSSION**

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that there has been a denial of a right, privilege, or immunity secured by the Constitution or laws of the United States and that the deprivation of such right occurred under color of state law. See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988). Section 1983 creates no substantive rights; rather, a plaintiff bringing a Section 1983 claim must demonstrate a violation of an independent federal constitutional or statutory right. See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617-18 (1979).

### A. Exhaustion

Defendants argue that Genao's claims are barred by the Prison Litigation Reform Act ("PLRA") because Genao never filed a grievance related to the incident, and therefore did not exhaust all steps required under the Inmate Grievance Resolution Program ("IGRP"). ECF No. 121 at 6-7. "Under the PLRA, '[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.'" Genao v. City of New York, No. 20-CV-2441 (LJL), 2021 WL 2111817, at *3 (S.D.N.Y. May 25, 2021) (quoting 42 U.S.C. § 1997e(a)) (alteration in original). "The exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" Id. (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)).

Genao, during the relevant incident, was detained at Rikers Island and thus his "grievance is governed by the [IGRP]," which requires inmates to follow a four-step procedure. See Pizarro v. Ponte, No. 17-CV-4412 (LGS), 2019 WL 568875, at *4 (S.D.N.Y. Feb. 11, 2019). First, the inmate must "submit a complaint for informal resolution." Id. "[S]econd, if the inmate disagrees

11

with the proposed resolution, the inmate has five business days to appeal and request a formal hearing; third, if the inmate disagrees with the Inmate Grievance Resolution Committee's disposition, the inmate has five business days to appeal to the commanding officer; fourth, if the inmate disagrees with the commanding officer's disposition, the inmate has five business days to appeal to the Central Office Review Committee, who will render a disposition within 15 business days of receiving the appeal." Id. (quoting IGRP § IV(D)-(J), Attachment B) (internal quotation marks and alterations omitted). "The inmate must take each of the four steps to exhaust the administrative grievance process." Id. (quoting Sanders v. City of New York, No. 16-CV-7426 (PGG), 2018 WL 3117508, at *4 (S.D.N.Y. June 25, 2018)). A plaintiff will be excused from following these administrative procedures in certain circumstances, including if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Colson v. Mingo, No. 18-CV-2765 (JGLC), 2024 WL 1018582, at *7 (S.D.N.Y. March 8, 2024) (quoting Williams v. Priatno, 829 F.3d 118, 123-24 (2d Cir. 2016)).

In his deposition, Genao testified that he "made complaints" and "wrote a grievance." ECF No. 133-1 at 54. Specifically, he stated that he "wrote a grievance" on the "grievance form" that he dropped off "[i]n the facility mailbox." Id. at 60. Genao testified that his grievance included "everything" regarding the incident and was "like [a] mini lawsuit[]." Id. at 61-62. He stated that he filed the grievance the day after the incident, which he recalled because it was on his birthday. Id. at 62. Although Genao could not remember whether he received a response to the grievance, he "know[s] [he] got a grievance number." Id. at 60. He further testified that he called the Board of Corrections, who were "aware of it." Id. at 62. Genao also claims that he appealed the grievance to Warden Glemaud (id. at 54, 60), but then they "removed [Genao] out

12

of the facility" (id. at 60). According to Genao, he filed an appeal with Warden Glemaud, because the prison did not "remed[y] anything" and to "preserve [his] right." Id. at 69. Genao testified that he does not have a copy of his grievance because his "property got destroyed." Id. at 80.

Defendants dispute that Genao filed a grievance, relying on a declaration from Ayouba Doumbia, a Data Analytics Manager at the Office of Constituent and Grievance Services. ECF No. 119-5 at ¶¶ 2, 5. Doumbia, who has "personal knowledge of DOC's grievance policies and procedures," conducted a search of the Department's Service Desk database system "for grievances and electronic complaints made by [Genao] regarding the Use of Force incident that occurred on March 19, 2019." Id. at ¶¶ 3, 5. According to Doumbia, his search "rendered (0) grievances and electronic complaints found." Id. at ¶ 5.

Plaintiff asserts, and Defendants concede, that excessive-force claims are not subject to the four-step IGRP process. ECF No. 127 at 10; ECF No. 121 at 7; see also Colson, 2024 WL 1018582, at *9 ("Plaintiff's excessive force claim is 'non-grievable' under the IGRP."). Although an inmate need not complete all the steps in the IGRP process for an excessive-force claim, he must file a formal complaint. House v. City of New York, No. 18-CV-6693 (PAE) (KNF), 2020 WL 6891830, at *9 (S.D.N.Y. Nov. 24, 2020) ("[E]ven when the exception applies and the full suite of IGRP procedures are not required, an inmate must still file a formal grievance to exhaust all remedies."). And "a § 1983 plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact." Garcia v. Heath, 74 F.4th 44, 49 (2d Cir. 2023) (citation and alterations omitted); see also Terry v. Hulse, No. 16-CV-252 (KMK), 2018 WL 4682784, at *10 (S.D.N.Y. Sept. 28, 2018) ("[T]he Court agrees with the numerous courts that have denied summary judgment based on sworn deposition testimony from

13

the [p]laintiff creating a dispute of material fact regarding whether a [p]laintiff's grievance was submitted.") (collecting cases).

Here, Genao testified during his deposition that he filed a formal complaint. ECF No. 133-1 at 54, 59-62. Additionally, Genao provided details about his grievance in his sworn deposition testimony, including when he filed it and the contents of the grievance. Id. at 54-69. Viewing the evidence in the light most favorable to Genao, Genao's testimony creates a dispute of fact as to whether he filed a grievance and exhausted his administrative remedies before filing this suit. See, e.g., Jackson v. Downstate Corr. Facility, No. 16-CV-267 (NSR), 2018 WL 3650136, at *8 (S.D.N.Y. July 31, 2018) (concluding that "[the] [d]efendants' argument that [the] [p]laintiff never actually filed his grievance . . . of no moment," because the plaintiff's deposition "demonstrates that [the] [p]laintiff made attempts to file a grievance in October of 2015, though there is no record of such a grievance with the IGRC"); Juarbe v. Carnegie, No. 15-CV-1485, 2016 WL 6901277, at *4 (N.D.N.Y. Nov. 23, 2016) (concluding that "questions of fact remain regarding the filing of the grievances," where the plaintiff alleged that he filed grievances but no record of the grievances being received or processed existed); cf. Trahan v. Capozzola, No. 12-CV-4353, 2017 WL 9512406, at *5-6 (E.D.N.Y. June 26, 2017) (denying summary judgment for claims where sworn testimony indicated that the plaintiff filed his grievance by giving it to a corrections officer, but granting summary judgment for claim where the plaintiff did "not state when he filed the grievance and otherwise proffer[ed] no details regarding its submission").

As such, a dispute of fact exists as to whether Genao filed a grievance pertaining to his claims, such that the Court cannot determine on summary judgment whether Genao exhausted his administrative remedies. See Colson, 2024 WL 1018582, at *9 (denying summary judgment

14

where there was an "issue of material fact as to whether Plaintiff filed a formal grievance and therefore exhausted administrative remedies with respect to [his excessive force] claim"). I therefore recommend denying Defendants' motion for summary judgment to the extent Defendants rely on Genao's failure to exhaust his administrative remedies under the PLRA.

**B.  Genao's Fourteenth Amendment, Excessive-Force Claim (Count III)**

Because Genao was a pretrial detainee at the time of the incident on March 16, 2019, his excessive-force claim is analyzed under the Fourteenth Amendment. See Pridgen v. Iland Jail, No. 22-CV-2294 (ER), 2023 WL 1438375, at *5 (S.D.N.Y. Feb. 1, 2023) ("The right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment."). A pretrial detainee's excessive-force claim under the Fourteenth Amendment requires a showing that the "force purposely or knowingly used" was "objectively unreasonable." Id. (quoting Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015)). "Courts consider several factors when determining objective reasonableness, including: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Richardson v. City of New York, No. 21-CV-5080 (PAE) (KHP), 2022 WL 18959559, at *9 (S.D.N.Y. Nov. 14, 2022), adopted by, 2023 WL 1777323 (S.D.N.Y. Feb. 6, 2023). "To prevail on an excessive force claim, a plaintiff must show that the defendant was personally involved in the alleged constitutional deprivation." Munoz v. Martinez, No. 03-CV-828 (LAK), 2005 WL 1355094, at *3 (S.D.N.Y. June 8, 2005) (citation omitted). "Personal involvement is not limited to direct participation." Russo v.

15

Golding, No. 07-CV-5795 (KMK) (MDF), 2008 WL 11517805, at *6 (S.D.N.Y. Feb. 11, 2008), adopted by, 2008 WL 11517804 (S.D.N.Y. June 13, 2008).

"[T]o succeed on a failure to intervene claim, a plaintiff must show '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would [have] know[n] that the victim's constitutional rights were being violated; and (3) the officer d[id] not take reasonable steps to intervene.'" Ismael v. Charles, No. 18-CV-3597 (GHW), 2020 WL 4003291, at *13 (S.D.N.Y. July 15, 2020) (quoting Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), aff'd sub nom. by, Jean-Laurent v. Wilkerson, 461 F. App'x 18 (2d Cir. 2012)). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (citation omitted).

Genao's excessive-force claim is asserted against Warden Glemaud and Captain Hyppolite and is based on two incidents: 1) Warden Glemaud's "unlawful order" to use pepper spray on all of the detainees, and 2) Captain Heeralal using pepper spray on Genao during an altercation between Genao and Officer Kissoon. ECF No. 45 at 11-12. Defendants argue that the excessive-force claim against Captain Hyppolite and Warden Glemaud should be dismissed because they were not personally involved in any alleged use of excessive force, and Genao cannot establish that the force was objectively unreasonable, such that the officers who witnessed the use of force should have intervened. ECF No. 121 at 8-9. The video of the incident demonstrates that neither Warden Glemaud nor Captain Hyppolite used pepper spray on any inmate. ECF No. 119-2 at 0:24:58 to 0:32:09. Because Warden Glemaud and Captain Hyppolite did not personally use pepper spray against Genao, to sustain an excessive-force claim, Genao

16

would need to prove that Warden Glemaud and Captain Hyppolite failed to intervene because they had reason to know "excessive force [wa]s being used" and "had a realistic opportunity to prevent the harm from occurring," but did nothing. Branen, 17 F.3d at 557.

The "use of pepper spray 'constitutes a significant degree of force' and can, in certain cases, form the basis of a constitutional violation." Stinson v. City of New York, No. 18-CV-27 (LAK) (BCM), 2021 WL 3438284, at *13 (S.D.N.Y. July 6, 2021) (quoting Tracy v. Freshwater, 623 F.3d 90, 98 (2d. Cir. 2010)). For example, the use of pepper spray could support an excessive-force claim when the inmate is handcuffed and not physically resisting. See, e.g., Tracy, 623 F.3d at 99 (reversing district court's finding that use of pepper spray was not excessive because a jury could conclude that the use of pepper spray "after [plaintiff] had already been handcuffed and was offering no physical resistance of police commands" was unreasonable); Toliver v. N.Y.C. Dep't of Corr., 202 F. Supp. 3d 328, 335 (S.D.N.Y. 2016) (reasoning that jury could conclude that use of pepper spray was "sufficiently serious by objective standards" where inmate was handcuffed, restrained, and sprayed in the "'upper torso/facial area' for at least two seconds"); cf. Urena v. City of New York, No. 22-CV-4679 (RA), 2024 WL 4149182, at *5 (S.D.N.Y. Sept. 10, 2024) (denying summary judgment because "[a] jury could thus find that [plaintiff], spitting from within a locked enclosure, did not pose a serious threat to the safety of officers or others" when officers responded with pepper spray) (internal quotation marks and citation omitted).

However, "[t]he use of pepper spray is not an actionable constitutional violation where there is no lasting injury, and where the subject was not cooperating with law enforcement." Walton v. Lee, No. 15-CV-3080 (PGG), 2019 WL 1437912, at *6 (S.D.N.Y. Mar. 29, 2019) (citation omitted). Still, "[i]f the challenged conduct was malicious or sadistic, it will be found to

17

rise to the level of a constitutional tort even without serious resultant injuries, provided the injuries were not *de minimis*." McCrory v. Belden, No. 01-CV-525 (MHD), 2003 WL 22271192, at *6 (S.D.N.Y. Sept. 30, 2003). "Because running a prison is an inordinately difficult undertaking, courts must afford prison officials some latitude to make good-faith efforts to maintain or restore discipline." Douglas v. City of New York, No. 18-CV-9327 (KPF), 2022 WL 294075, at *6 (S.D.N.Y. Feb. 1, 2022) (internal quotation marks, citations, and alterations omitted). "If the force was 'applied in a good-faith effort to maintain or restore discipline, it is unlikely to be repugnant to the conscience of mankind, and will not amount to excessive force under Second Circuit law.'" Id. (quoting Quinones v. Rollison, No. 18-CV-1170 (AJN), 2020 WL 6420181, at *4 (S.D.N.Y. Nov. 1, 2020)).

As the video of the incident demonstrates, pepper spray was used twice. It was first used by Officer Shaw while the inmates that had gathered in the dayroom were kneeling or lying on the floor. Officer Shaw sprayed in the direction of the prisoners but did not aim the pepper spray at any specific inmate. ECF No. 119-2 at 24:58 to 0:25:03. Captain Hyppolite was in the dayroom at this time. ECF No. 119-2 at 0:24:56-0:25:01. Warden Glemaud was not. Genao argues that the use of pepper spray by Officer Shaw was excessive because the detainees were not posing a threat or otherwise resisting the officers. ECF No. 127 at 13. But the detainees were unrestrained, there were multiple detainees in the dayroom, and the detainees had refused, for at least ten minutes, repeated orders to return to their cells. See ECF No. 119-2 at 0:03:26 to 0:03:29 (officer telling other officers that the detainees "said they are not complying"), 0:06:33 to 0:06:39 (Captain Hyppolite stating "Gentlemen, every one of you step inside these cells"), 0:12:04 to 0:12:08 (officer stating "it's time for y'all to lock in, it's 9 o'clock"), 0:16:04 to 0:16:10 (Captain Hyppolite stating "this is your last and final warning"). And when the officers

18

first encountered the detainees, the detainees were being loud and disruptive, throwing objects, and climbing the railings of the common area. See id. at 0:02:20 to 0:09:43. The officers could have reasonably believed that the encounter might escalate if the detainees continued to refuse orders to return to their cells. Moreover, the video shows that Officer Shaw did not aim the pepper spray at any specific inmate. Instead, Officer Shaw deployed the pepper spray into the air, while many of the inmates were on the ground, facing away from the pepper spray. See id. at 0:24:58 to 0:25:03.

Under these circumstances, no reasonable juror could conclude that the use of force was objectively unreasonable. See, e.g., Vazquez v. Spear, No. 12-CV-6883 (VB), 2014 WL 3887880, at *5 (S.D.N.Y. Aug. 5, 2014) (dismissing excessive-force claim on summary judgment where video "demonstrates that plaintiff was a recalcitrant inmate, and thus defendants' use of chemical agents to force compliance with direct orders was . . . a good faith effort to restore order") (internal quotation marks and citation omitted); Harris v. Ashlaw, No. 07-CV-358, 2007 WL 4324106, at *7 (N.D.N.Y. Dec. 5, 2007) (finding use of chemicals to extract plaintiff from cell was not excessive as the "direct result of his refusal to obey an order issued by corrections officials to exit his cell" because even if plaintiff "believed that his defiance of defendants' direct order was justified, it does not shield him from the consequences associated with his refusal to comply"); Kopy v. Howard, No. 07-CV-417, 2010 WL 3808677, at *3 (N.D.N.Y. Aug. 11, 2010), adopted by, 2010 WL 3807166 (N.D.N.Y. Sept. 21, 2010) (dismissing plaintiff's excessive-force claim on motion to dismiss where plaintiff admitted "he refused several direct orders to return to his cell and, as a consequence, was forcibly moved there by use of pepper spray"); Johnson v. Sootsman, 79 F.4th 608, 620 (6th Cir. 2023) ("[W]e have repeatedly described the use of a taser or pepper spray as a proportional level of force in

response to a prisoner's refusal to follow orders, including an order to accompany an officer and an order to exit the shower.") (internal quotation marks and citations omitted); McCamey v. Snohomish Cnty. Jail, No. 07-CV-13, 2007 WL 3275100, at *3 (W.D. Wash. Nov. 2, 2007) ("Courts have found the use of pepper spray or other substances in response to a refusal to follow directions to fall within the wide range of deference accorded prison officials in response to breaches of prison discipline.") (collecting cases). Because the use of pepper spray by Officer Shaw does not amount to excessive force, Captain Hyppolite, who was present in the dayroom, would have had no obligation to intervene.

Turning to Warden Glemaud, he was not in the room at the time Officer Shaw used the pepper spray. ECF No. 119-3 at ¶ 8. However, Genao claims that Warden Glemaud gave the order to use pepper spray via a walkie-talkie. ECF No. 131 at ¶ 11. To the extent that Genao argues that Warden Glemaud is liable under a theory of supervisory liability because he ordered the use of pepper spray (ECF No. 127 at 16), this claim necessarily fails. "[W]here there is no underlying deprivation of rights, there can be no supervisory liability." Garcia-Garcia v. City of New York, No. 12-CV-1302 (CM), 2013 WL 3832730, at *10 (S.D.N.Y. July 22, 2013) (internal quotation marks and citations omitted). Because Officer Shaw's use of pepper spray did not constitute excessive force, Warden Glemaud cannot be liable under a theory of supervisory liability. See, e.g., Cruz v. City of New Rochelle, No. 13-CV-7432 (LMS), 2017 WL 1402122, at *25-27 (S.D.N.Y. Apr. 3, 2017) (dismissing supervisory liability claim where there was no excessive force).

Pepper spray was also used a second time on March 16, 2019, this time by Captain Heeralal. After Officer Shaw's use of pepper spray, there was an altercation between Officer Kissoon and Genao, and during that altercation, Captain Heeralal used pepper spray on Genao.

20

See ECF No. 119-2 at 0:25:03 to 0:25:09. Here, too, liability against the two officers whom the claim is asserted against (Warden Glemaud and Captain Hyppolite) is premised on a failure to intervene. As an initial matter, all of the reasons just discussed why the use of pepper spray by Officer Shaw would not have amounted to excessive force apply to the use of pepper spray by Captain Heeralal. As discussed, the video shows multiple detainees in the dayroom, all of whom are unrestrained, and the detainees had refused repeated orders to return to their cells. Additionally, the video shows Captain Heeralal used pepper spray in response to Genao's conduct towards Officer Kissoon. Shortly after the use of pepper spray by Officer Shaw, the video shows an altercation between Genao and Officer Kissoon, where Genao hit Officer Kissoon and the two fall to the ground in a physical scuffle. Id. at 0:25:03 to 0:25:15.

Moreover, it is undisputed that Warden Glemaud was not in the room at the time that Captain Heeralal used the pepper spray. ECF No. 131 at ¶ 9. And there is no evidence in the record to indicate that Warden Glemaud would have seen Captain Heeralal use the pepper spray. There thus is no basis to conclude that Warden Glemaud would have had an obligation to intervene in the incident and time to do so. Lennox v. Miller, 968 F.3d 150, 158 (2d Cir. 2020) (affirming district court's grant of summary judgment to officer where there was "no evidence in the record that would suggest [the officer] had a realistic opportunity to intervene that he then disregarded"); Sash v. United States, 674 F. Supp. 2d 531, 545 (S.D.N.Y. 2009) (finding that no reasonable jury could conclude that defendant officers had a genuine opportunity to intercede where "the entire incident took less than thirty seconds"); O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988) (rejecting plaintiff's claims of failure to intervene where the alleged excessive force consisted of three rapid blows because the officer "had no realistic opportunity to attempt to prevent them"); Lennox, 968 F.3d at 158 ("Even assuming that [officer] observed [other

21

officer's] use of force, there is no evidence in the record that would suggest he had a realistic opportunity to intervene that he then disregarded.").

As to Captain Hyppolite, Genao also cannot show that Captain Hyppolite should have intervened in the use of pepper spray by Captain Heeralal. The video shows that Captain Hyppolite, who is wearing vest 083, had his back to Captain Heeralal at the time that Captain Heeralal used the pepper spray against Genao. See ECF No. 119-2 at 0:25:03. Captain Hyppolite therefore did not see Captain Heeralal use the pepper spray and he also did not see the altercation between Genao and Officer Kissoon. At the point in time that Captain Heeralal turned to see what was occurring in the room, Captain Hyppolite would have seen Genao punching Officer Kissoon. Id. at 0:25:08- 0:25:13. Simply stated, the events that Captain Hyppolite would have seen—Genao fighting with and hitting another officer—would have reasonably led Captain Hyppolite to believe that the use of pepper spray was appropriate. See, e.g., Santana v. City of Hartford, 283 F. Supp. 2d 720, 727-28 (D. Conn. 2003) (dismissing Section 1983 claim as a matter of law where officer did not intercede on force used on plaintiff after defendant officer watched plaintiff charge at other officer with a knife); Parker v. Santos, No. 19-CV-6945 (JS) (JMW), 2024 WL 4243663, at *11 (E.D.N.Y. Aug. 15, 2024), adopted sub nom. by, Parker v. Inc. Vill. of Freeport, 2019 WL 13540727 (E.D.N.Y. Sept. 10, 2024) (finding officer "acted with reasonable force in taking down [p]laintiff after seeing [p]laintiff use force against a fellow officer").

Because Genao's excessive-force claims against Warden Glemaud and Captain Hyppolite fail as a matter of law, the Court need not consider Defendants' arguments on qualified immunity. See, e.g., France v. Morton, No. 12-CV-5576 (KMK), 2018 WL 1276860, at *13 n.18 (S.D.N.Y. Mar. 9, 2018) ("Because the Court concludes that there is no dispute of material fact

regarding whether [d]efendant used excessive force, it need not reach [d]efendant's alternative argument that he is entitled to qualified immunity."). I therefore respectfully recommend that Defendants be granted summary judgment on Genao's excessive-force claims against Warden Glemaud and Captain Hyppolite in Count III.

**C. Genao's Fourteenth Amendment, Deliberate-Indifference Claim (Count V)**

### 1. Deliberate Indifference to Medical Needs

Construing Genao's allegations liberally, Genao's deliberate-indifference claim has two grounds. First, he alleges that Warden Glemaud and Captain Hyppolite were deliberately indifferent to his medical needs—Genao is asthmatic—when they sprayed him with pepper spray despite being aware that Genao had "contraindictation [sic] that prohibits the use of chemical agents." ECF No. 45 at 12; ECF No. 127 at 18. And second, Genao alleges that Warden Glemaud and Captain Hyppolite were deliberately indifferent to Genao's medical needs when they did not allow him to decontaminate for several hours after having been sprayed with pepper spray. ECF No. 45 at 12.

First, Genao claims that Warden Glemaud and Captain Hyppolite were deliberately indifferent to his medical needs because they used pepper spray on him despite knowing that Genao has asthma. Id. As already discussed, neither Warden Glemaud nor Captain Hyppolite used pepper spray; Officer Shaw and Captain Heeralal used pepper spray. Defendants argue that because Captain Hyppolite and Warden Glemaud did not use pepper spray, Genao cannot sustain a deliberate-indifference claim against them because they were not personally involved in the incident. ECF No. 121 at 13. Alternatively, Defendants argue that the claim fails because there is no evidence in the record that Captain Hyppolite and Warden Glemaud were aware of Genao's asthma and thus they could not have known that the use of pepper spray would pose an excessive risk to Genao's health. Id. Finally, Defendants contend that even if these two officers were aware

23

of Genao's asthma, asthma is not a sufficiently serious medical condition to support a deliberate-indifference claim. Id.

A claim for deliberate indifference to medical needs has two elements.[10] "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." Spavone v. New York State Dep't of Corr. Servs., 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks and citation omitted). "The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." Id. With respect to the first element, "determining whether a deprivation is an objectively serious deprivation entails two inquiries." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). "The first inquiry is whether the prisoner was actually deprived of adequate medical care." Id. If so, "the objective test asks whether the inadequacy in medical care is sufficiently serious." Id. at 280. "[A] medical need is sufficiently serious if it presents a condition of urgency, one that may produce death, degeneration, or extreme pain." Williams v. City of New York Dep't of Corr., No. 19-CV-9528 (ER), 2020 WL 3893929, at *4 (S.D.N.Y. July 10, 2020) (internal quotation marks and citation omitted). With respect to the second element, "the subjective '*mens rea* prong' of deliberate indifference to serious medical needs claims" under the Fourteenth Amendment are analyzed "objectively[;]" courts are to "determine whether the official 'knew, or should have known' that his or her conduct 'posed an excessive risk to health or safety.'" Fernandini v. United States, No. 15-CV-3843 (GHW), 2017 WL 3208587, at *7 (S.D.N.Y. July 26, 2017) (quoting Darnell v. Pineiro, 849 F.3d 17, 33 (2d Cir. 2017)). "[M]ere negligence will not suffice; a pretrial detainee

---

[10] As discussed, Genao's deliberate-indifference claim is analyzed under the Fourteenth Amendment because he was a pretrial detainee at the time of the incident. See Colon v. City of New York, No. 08-CV-3142 (HB), 2009 WL 1424169, at *5 (S.D.N.Y. May 21, 2009) (citing Bryant v. Mafucci, 923 F.2d 979, 983 (2d Cir. 1991)).

24

'must prove that an official acted intentionally or recklessly, and not merely negligently.'"
Massey v. Morgan, No. 18-CV-3994 (ALC) (KHP), 2021 WL 3887947, at *4 (S.D.N.Y. Aug. 31, 2021) (quoting Darnell, 849 F.3d at 36).

Beginning with the second element of the claim, there is no evidence in the record demonstrating that Captain Hyppolite or Warden Glemaud acted intentionally or recklessly failed to act with reasonable care to mitigate the threat to Genao's health even if they knew, or should have known, that the use of pepper spray or the failure to quickly decontaminate posed an excessive risk to Genao's health because of his asthma. See Swinson v. City of New York, No. 19-CV-11919 (KPF), 2022 WL 142407, at *9 (S.D.N.Y. Jan. 14, 2022). Genao argues that he had a "contraindictation [sic] that prohibits the use of chemical agents." ECF No. 45 at 12. But Genao does not provide the medical directive, and the medical directive is not in the record before the Court. Further, there are no facts in the record suggesting that Captain Hyppolite or Warden Glemaud knew or should have known of the directive. There thus is no evidence from which to conclude that Captain Hyppolite or Warden Glemaud could have, or should have, known that the use of pepper spray on Genao by other officers would pose "an excessive risk to health or safety." See Swinson, 2022 WL 142407, at *9 (citing Darnell, 849 F.3d at 35); see also Perkins v. Schriro, No. 11-CV-814 (GBD) (JCF), 2012 WL 5909892, at *2 (S.D.N.Y. Nov. 21, 2012); Genao v. City of New York, No. 21-CV-301 (AT) (VF), 2024 WL 947439, at *10 (S.D.N.Y. Jan. 4, 2024), adopted by, 2024 WL 515246 (S.D.N.Y. Feb. 9, 2024) (finding that even if the defendant officers knew of the medical directive, it "does not contain any information from which [defendant officers] could have, or should have, known that spraying Genao with [pepper] spray would pose an excessive risk to health or safety"). Because Genao has failed to show that Captain Hyppolite or Warden Glemaud acted with a "sufficiently culpable state of

mind," Colon v. City of New York, No. 08-CV-3142 (HB), 2009 WL 1424169, at *5 (S.D.N.Y. May 21, 2009) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)), he fails to satisfy the subjective prong of a deliberate-indifference claim.

Moreover, Genao's claim fails for an additional reason: he has not established that he suffered a sufficiently serious medical need "that may produce death, degeneration, or extreme pain." Williams, 2020 WL 3893929, at *4 (citation omitted). Genao claims that he "complained of chest pains and needed his asthma pump" (ECF No. 127 at 17), had "difficult[y] breathing" (ECF No. 131 ¶ 20), or "couldn't breathe" (ECF No. 133-1 at 57), and his lungs felt cold (ECF No. 45 at ¶ 32). He also indicates that he "could only take short breath[]s," his "blood pressure was high," and he was anxious. ECF No. 45 at ¶ 39. Finally, Genao states that his face was swollen and bruised, and he was "scraped up." Id. at ¶ 43. Genao does not allege that he suffered an asthma attack. But even if Genao's testimony concerning his injuries are credited, he does not point to any serious medical need that resulted from the use of pepper spray. See, e.g., Rodriguez v. Cohall, No. 21-CV-1810 (JGK), 2022 WL 1228411, at *4 (S.D.N.Y. Apr. 26, 2022) (dismissing deliberate-indifference claim where the plaintiff alleged that "he was completely denied medical care following his exposure to chemical agents" but "failed to allege that he suffered an injury that was sufficiently serious" despite alleging that he experienced "breathing difficulties, chest pains, blurry vision, dizzyness [sic], skin burning/irritation, trauma, [and] anxiety") (alterations in original); Taylor v. Quayyum, No. 16-CV-1143 (GHW), 2021 WL 6065743, at *6 (S.D.N.Y. Dec. 21, 2021) (concluding that plaintiff did not "allege an injury that [wa]s sufficiently serious to state a claim for deliberate indifference to medical needs" where plaintiff's alleged injuries included "rest[r]icted breathing, [coughing], sneezing, burning of eyes and throat, skin irritation [and] mental anguish") (alterations in original); Johnson v. Schiff, No.

26

17-CV-8000 (KMK), 2019 WL 4688542, at *13-14 (S.D.N.Y. Sept. 26, 2019) (dismissing deliberate-indifference claim where plaintiff "[did] not allege facts suggesting that he suffered permanent effects or serious injury from the pepper spray" and where plaintiff's injuries included "scrapes and cuts" from a fight with an inmate and "burning" pain from pepper spray that lasted two weeks); White v. Williams, No. 12-CV-1892, 2016 WL 1237712, at *11 (N.D.N.Y. Jan. 11, 2016) (finding injuries to an inmate's eye and ribs, coughing and spitting up blood, cuts to the inmate's face, and lingering chest pain did not "constitute serious medical needs as a matter of law"); Holmes v. City of New York, No. 17-CV-3874 (WHP), 2018 WL 4211311, at *7 (S.D.N.Y. Sept. 4, 2018) (finding that chemical-spray induced coughing that exacerbated the pain to plaintiff's previously fractured ribs that was untreated for three days insufficient to constitute a serious medical need).

Further, Genao can be heard on the video after the incident telling the other detainees that he was "good" (ECF No. 119-2 at 0:29:12 to 0:29:15), and Genao was able to stand up, with assistance, and walk out of the dayroom (id. at 0:31:57 to 0:32:08). Additionally, the record refutes any claim by Genao that he suffered a serious injury but that the injury was not reflected in his medical records because he was intimidated into not reporting his injuries. ECF No. 133-1 at 49-50. In that regard, Genao, at his deposition, specifically denied having other physical injuries (id. at 58), and also denied requesting medical care in the month after the incident (id. at 78).[11] In short, Genao's deliberate-indifference claim fails because there is no evidence in the

---

[11] Specifically, in his deposition, Genao was asked if there were "any other physical injuries outside of the ones just mentioned," and he responded "[n]o." ECF No. 133-1 at 58. When asked if there were any "lasting psychological injury from this incident," Genao responded that "any time [he] see[s] a spray, [he] get[s] afraid." Id. at 59. When asked if he "request[ed] any medical attention in the month after the incident," Genao responded "[n]o." Id. at 78. Genao could not remember whether he "request[ed] to go to the clinic the month after the incident." Id.

record to demonstrate that Captain Hyppolite or Warden Glemaud acted with the requisite mental state or that Genao suffered a sufficiently serious medical need.

    *2. Deliberate Indifference to Conditions of Confinement*

Genao alleges that Warden Glemaud and Captain Hyppolite were deliberately indifferent to his conditions of confinement when they locked him in an inoperable cell without a working toilet or faucet while "drenched" in pepper spray for over four hours after being pepper sprayed. ECF No. 131 at ¶¶ 19-20. He further contends that Warden Glemaud directed officers to wait to decontaminate Genao last. Id. at ¶ 21.

To establish a claim based on conditions of confinement, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." Darnell, 849 F.3d at 30 (internal quotation marks and citations omitted). "Although the Constitution does not require comfortable prison conditions, the conditions of confinement may not involve the wanton and unnecessary infliction of pain." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted). "The 'proper lens' through which to assess conditions of confinement 'is with reference to their severity and duration, not the detainee's resulting injury.'" Gumora v. City of New York, No. 17-CV-2300 (LGS), 2018 WL 736018, at *4 (S.D.N.Y. Feb. 5, 2018) (quoting Darnell, 849 F.3d at 30). Similar to a claim for deliberate indifference to medical needs, for deliberate indifference to conditions of confinement, a detainee must show "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference

28

to inmate health or safety." Barry v. Russo, No. 22-CV-3835 (KMK), 2024 WL 965000, at *10 (S.D.N.Y. Mar. 5, 2024) (citation omitted).

Beginning with the second element of a deliberate-indifference claim, as already discussed, there is no evidence in the record that either defendant knew of Genao's asthma or the medical directive. And as to Captain Hyppolite, Genao puts forth no facts to demonstrate that Captain Hyppolite knew that Genao was left in a cell and not decontaminated for four hours. See, e.g., Barry, 2024 WL 965000, at *11 (dismissing conditions of confinement claim where plaintiff failed to assert that the defendants were aware of the condition). As to Warden Glemaud, even if Genao's assertion that Warden Glemaud directed that Genao be decontaminated last is credited, there is no evidence that Warden Glemaud knew or should have known that the condition posed an excessive risk to Genao's health. See, e.g., Urena v. City of New York, No. 24-CV-1886 (LTS), 2024 WL 3105082, at *4 (S.D.N.Y. June 21, 2024) (dismissing conditions of confinement claim where plaintiff did not allege "that defendant knew, or should have known, that such conditions of confinement posed an excessive risk to [p]laintiff's health or safety").

Moreover, even if Warden Glemaud and Captain Hyppolite were aware that the conditions of Genao's confinement posed an excessive risk to Genao's health, Genao would still be unable to satisfy the first element of a deliberate-indifference claim. The record establishes that Genao was left in the cell for approximately four hours before he was decontaminated after being sprayed with pepper spray. ECF No. 120 at ¶ 13; ECF No. 131 at ¶ 22; ECF No. 133-1 at 47. To demonstrate that the condition of confinement was sufficiently serious to support a deliberate-indifference claim, Genao would have had to endure the conditions he describes for a significantly greater period of time. See, e.g., Genao v. City of New York, No. 21-CV-303 (AT) (VF), 2023 WL 4633486, at *9 (S.D.N.Y. June 20, 2023), adopted by, 2023 WL 4625522

29

(S.D.N.Y. July 19, 2023) (finding dispute of material fact on conditions of confinement claim where Genao "was left in a cell for approximately 15 hours with residual chemical agents in the cell and on his person"); El-Massri v. Marmora, No. 18-CV-1249, 2022 WL 6170681, at *14-17 (D. Conn. Oct. 7, 2022) (finding a dispute of material fact as to whether plaintiff met objective prong of deliberate-indifference claim after being pepper sprayed and not decontaminated for three days); cf. Williams v. City of New York, No. 19-CV-3347 (LJL) (JLC), 2022 WL 130409, at *26 (S.D.N.Y. Jan. 14, 2022), adopted sub nom. by, Williams v. N.Y.C. Dep't of Corr., 2022 WL 446041 (S.D.N.Y. Feb. 14, 2022) (dismissing deliberate-indifference claim at summary judgment where plaintiff was not decontaminated from pepper spray for eight hours).

In sum, as it concerns this aspect of Genao's deliberate-indifference claim, Genao's claim fails for the same reasons: he has not adduced evidence to support a finding that Captain Hyppolite and Warden Glemaud were aware, or should have been aware, that Genao's conditions of confinement posed an excessive risk to Genao's health, and he also has not adduced evidence to show that the deprivation that he suffered was sufficiently serious. I therefore recommend that summary judgment be granted to Defendants on Genao's deliberate-indifference claim in its entirety.

### D. Genao's First Amendment Claims Against Warden Glemaud (Counts I and II)

Construing Genao's claims broadly, Genao alleges that his First Amendment rights were violated when Warden Glemaud threatened Genao that he should not report any injuries after the incident. ECF No. 45 at 11. Genao also alleges that Warden Glemaud intimidated him into not reporting any injuries because Warden Glemaud was present during the examination with the doctor. Id. Defendants argue that Genao's medical records show that he did not suffer any

injuries and Genao testified during his deposition that he did make a complaint the day after the incident. ECF No. 121 at 14-15.

To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [inmate], and (3) that there was a causal connection between the protected conduct and the adverse action." Holland v. Goord, 758 F.3d 215, 225 (2d Cir. 2014) (citation and alteration omitted). "With respect to the third element, when the alleged harm is that a plaintiff's speech was chilled, a plaintiff must show that her First Amendment rights were 'actually chilled.'" Gonzalez v. City of New York, No. 14-CV-7721 (LGS), 2016 WL 5477774, at *6 (S.D.N.Y. Sept. 29, 2016), on reconsideration in part, 2017 WL 149985 (S.D.N.Y. Jan. 13, 2017) (quoting Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001)). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." Id. (internal quotation marks, citation, and alterations omitted). "[A] plaintiff asserting First Amendment retaliation must allege some sort of harm," but the harm need not, "in all cases, be a chilling of speech." Gill v. Pidlypchak, 389 F.3d 379, 383 (2d Cir. 2004). "In the prison context, the harm could include such an adverse action as placing a plaintiff in keeplock for a period of weeks." Id.

Genao has not alleged that his speech was chilled or that he suffered another adverse action. Crediting Genao's version of events, Warden Glemaud intimidated him into not reporting

31

injuries and consequently the medical report after the incident indicates that Genao "denied any injury" and "refused vital signs and physical examination." ECF No. 119-4 at 1. But Genao does not claim any harm that he suffered from being unable to report an injury that would not have been readily apparent to the doctor during a visual examination. The medical report states that "no visible injuries noted." Id. And he testified during his deposition that he did not seek any medical care in the month after the incident, undermining any claim of other non-visible injuries. ECF No. 133-1 at 78. Additionally, in Genao's deposition, when asked if there were "any other physical injuries outside of the [scrapes and bruises]," Genao responded "[n]o." Id. at 58. The record does not indicate that Genao suffered any actual harm, such as lasting pain, untreated injuries, or other issues, from being unable to report his injuries to the doctor. See, e.g., George v. Rockland State Psychiatric Ctr., No. 10-CV-8091 (NSR), 2014 WL 5410059, at *5 (S.D.N.Y. Oct. 23, 2014) (granting summary judgment to defendants as to First Amendment claim where plaintiff did not provide evidence "that his First Amendment rights were actually chilled or that he suffered any other concrete harm"); Huertas v. Ivanko, No. 11-CV-528, 2013 WL 1193187, at *13 (D. Conn. Mar. 25, 2013) (concluding that First Amendments rights were not violated where there was no "evidence in the record of an actual chilling effect (aside from the conclusory allegation in [p]laintiff's complaint that his First Amendment rights were violated)").

I thus recommend that Defendants be granted summary judgment on Genao's First Amendment claims in Counts I and II.

### E. Municipal Liability

Genao asserts a claim for municipal liability against the City (ECF No. 45 at 11-13), but "the language of § 1983 makes clear that 'Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional

tort.'" Diarra v. City of New York, No. 16-CV-7075 (VSB), 2018 WL 4538903, at *4 (S.D.N.Y. Sept. 20, 2018) (quoting Monell, 436 U.S. at 691). To succeed on his claim against the City under § 1983 based on acts by the individual defendants, Genao must show the "deprivation of a constitutional or statutory right" pursuant to "an official policy of the municipality." Cowan v. City of Mount Vernon, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015) (quoting Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008)). Because all of Genao's claims fail, there is no conduct by an individual officer that could have resulted in a violation of Genao's constitutional rights. This alone is fatal to Genao's Monell claim against the City. See, e.g., King v. City of New York, 581 F. Supp. 3d 559, 577 (S.D.N.Y. 2022), aff'd by, No. 22-231, 2023 WL 2398679 (2d Cir. Mar. 8, 2023) ("Because King has failed to plausibly allege a denial of a constitutional right, his Monell claim cannot be sustained.") (internal quotation marks and citation omitted); Bruno v. City of New York, No. 17-CV-7552 (PGG), 2019 WL 690340, at *16 (S.D.N.Y. Feb. 19, 2019) ("Because Plaintiff has not demonstrated that he suffered a constitutional violation, the City is entitled to summary judgment on his Monell claim.").

Regardless, even if Genao had been able to establish the existence of a constitutional violation, his Monell claim would still fail because there is no evidence in the record that the conduct by the individual officers occurred pursuant to a policy or custom of the City. Merely providing "[p]roof of a single incident of unconstitutional activity" is insufficient to impose municipal liability, "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy[.]" City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) (plurality opinion); see also Cowan, 95 F. Supp. 3d at 637 ("Generally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality.") (internal quotation marks, citation, and alteration omitted); Guerrero v.

33

City of New York, No. 12-CV-2916 (RWS), 2013 WL 673872, at *3 (S.D.N.Y. Feb. 25, 2013) ("[B]oilerplate assertions of a municipal policy or custom . . . without offering any accompanying factual support . . . are insufficient to state a claim for [municipal] liability.").

Here, the record contains evidence of only a single incident involving Genao. There is no evidence that the individual officers were acting pursuant to a formal policy, a widespread and consistent practice, or a failure by City officials to provide adequate training or supervision. See, e.g., Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 222 (2d Cir. 2004) (affirming summary judgment for defendants on Title VII claims where plaintiff relied solely on conclusory assertions concerning the existence of a policy or custom); Fowler v. City of New York, No. 13-CV-2372 (KAM) (ST), 2019 WL 1368994, at *15 (E.D.N.Y. Mar. 26, 2019), aff'd by, 807 F. App'x 137 (2d Cir. 2020) ("Because plaintiff's alleged constitutional violations concern only himself, coupled with the limited number of alleged violations he brings, as a matter of law he cannot establish a finding of widespread practice supporting a custom or usage theory under Monell."); Kiss v. Torres, No. 21-CV-10391 (KMK), 2024 WL 1210941, at *23 (S.D.N.Y. Mar. 19, 2024) (dismissing Monell claim where plaintiff points only to alleged constitutional deprivations that he suffered and "fails to identify any other incidents that would indicate a pattern or practice") (collecting cases).

In his amended complaint, Genao alleges generally that the consent decree in Nunez v. New York City Department of Correction "demonstrates a pattern of an unwritten custom and policy that satisfied this claim in whole."[12] See ECF No. 45 at 13. Genao argues that Defendants'

---

[12] In 2011, The Legal Aid Society filed a class-action lawsuit on behalf of New York City inmates that alleged a pattern and practice concerning the use of excessive force in New York City jails. See Nunez v. N.Y.C. Dep't of Corr., No. 11-CV-5845 (LTS) (S.D.N.Y. May 24, 2012), ECF No. 15 at 2. The class action resulted in a consent decree, which included revised policies around use-of-force training, the reporting and investigation of incidents, and increased

actions violate the consent decree in Nunez. ECF No. 127 at 19. But Genao's reliance on the

consent decree is misplaced. As an initial matter, the facts underlying Nunez occurred in 2010,

long before the March 2019 incident here. In other words, Genao points to past conduct but there

is no evidence in the record that the Defendants here were acting pursuant to any present custom

or policy by the City. Moreover, other courts in this Circuit have concluded that a "[p]laintiff's

reliance on reports and articles regarding misconduct by NYPD officers are inadequate to allege

a policy or custom of the City, let alone allege that that policy or custom is the one that gave rise

to *Plaintiff's* alleged violation." Aguirre v. City of New York, No. 15-CV-6043 (PKC), 2017 WL

4236552, at *6 (E.D.N.Y. Sept. 22, 2017) (collecting cases) (internal quotation marks and

citation omitted, italics in original). Stated another way, the consent decree does not "provide the

necessary specificity to render a municipal liability claim plausible, since [Genao] does not refer

to any particular findings or documents from these cases that support his theory that there was a

specific policy that impacted him." See Milhouse v. City of New York, No. 24-CV-611 (LAK)

(KHP), 2024 WL 5716620, at *15 (S.D.N.Y. Dec. 6, 2024).

Accordingly, to the extent Genao points to the City's lack of progress towards prison

reform, stemming from the Nunez consent decree (ECF No. 127 at 19-20), that alone cannot

support a finding that the individual officers (even if they did commit a constitutional violation)

acted pursuant to a policy or custom of the City. See, e.g., Milhouse, 2024 WL 5716620, at *3,

15 (dismissing municipal liability claim where plaintiff based policy and custom on "several

litigations in federal and state court involving conditions at Rikers," including Nunez); Hickey v.

---

video surveillance, among other things. See Nunez, No. 11-CV-5845 (LTS) (S.D.N.Y. Oct. 21,
2015), ECF No. 249; see also Michael Jacobson et al., Beyond the Island: Changing the Culture
of New York City Jails, 45 Fordham Urb. L.J. 373, 392-402 (2018) (summarizing provisions of
the Nunez Consent Decree).

City of New York, No. 01-CV-6506 (GEL), 2004 WL 2724079, at *21 (S.D.N.Y. Nov. 29, 2004), aff'd by, 173 F. App'x 893 (2d Cir. 2006) (granting summary judgment and dismissing Monell claim because the court cannot "take judicial notice of a number of highly-publicized episodes of alleged police abuse or brutality" and "extrapolate from those assumptions an effect on the present episode").

In short, Genao has not adduced any evidence from which a reasonable factfinder could conclude that the individual Defendants (even if they did commit a constitutional violation) were acting pursuant to a policy or custom of the City. See Brock v. City of New York, No. 15-CV-1832 (VSB), 2018 WL 3579099, at *12 (S.D.N.Y. July 25, 2018) (granting summary judgment on municipal liability claim where plaintiff offered "no direct or circumstantial evidence of a municipal policy, custom, or practice"). I therefore recommend that summary judgment be granted to the City on Genao's municipal liability claim.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that Defendants' motion for summary judgment be **GRANTED** in full and Genao's claims be dismissed.

**SO ORDERED.**

DATED:    New York, New York
          January 20, 2026

Respectfully submitted,

VALERIE FIGUEREDO
United States Magistrate Judge

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable George B. Daniels. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**